William GELLER and Doris Geller, Petitioners-Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.

No. 787, Docket 76–4248.

United States Court of Appeals, Second Circuit.

Argued April 6, 1977.

Decided June 10, 1977.

Irwin Geller, New York City, for petitioners-appellants.

Myron C. Baum, Acting Asst. Atty. Gen., Gilbert E. Andrews, William A. Friedlander, and Sharon A. Calegari, Attys., Tax Div., Dept. of Justice, Washington, D. C., for respondent-appellee.

Before OAKES, Circuit Judge, HOLDER, District Judge,* and WYZANSKI, Senior District Judge.**

WYZANSKI, Senior District Judge:

Taxpayers, William and Doris Geller, who, as husband and wife, filed joint federal income tax returns, appeal from the August 18, 1976 order of the United States Tax Court deciding that there are deficiencies in income taxes due from both of them in specified amounts for the years 1965 and 1966 and that for the same years there are additions to the tax, pursuant to Section 6653(b) of the Internal Revenue Code of 1954, due from William Geller.

The principal questions are (1) whether in either 1965 or 1966 or both years William Geller made "a false or fraudulent return with the intent to evade tax", or a "willful attempt to evade tax", so that, pursuant to Section 6501(c)(1) or (2) of the Internal Revenue Code of 1954, assessments and proceedings with respect to such year or years are not governed by the 3 year period of limitation provided in Section 6501(a) of the Code, and (2) whether in either 1965 or 1966 or both years, any part of any underpayment of the tax required to be shown on a return was due to the fraud of Dr. Geller so that "there shall be added to the tax [due from him] an amount equal to 50 percent of the underpayment", in accordance with Section 6653(b) of the Code.

The facts found by the Tax Court are to the following effect.

In each of the years 1965 and 1966 Dr. and Mrs. Geller filed a joint federal income tax return reporting that they owed no tax. In the first of those years they reported that their *sole* taxable income was from his practice of medicine which was overbalanced by his business deductions. In the second of those years they reported that their *sole* taxable income was from his practice of medicine and that, after business deductions, their gross profit was only $3,092.15. In neither year did taxpayers show income from dividends, securities transactions, or any source other than from Dr. William Geller's medical practice.

Before either of the taxable years now under scrutiny, that is to say in 1953 and 1954, Dr. Geller had filed federal tax returns upon the basis of which he was convicted of the crime of willful evasion of tax, and which led to his making in 1964 a compromise settlement of the government's civil claims. In support of that settlement, Dr. Geller filed on Form 433 statements of financial condition asserting that he had assets of only $650 and liabilities, (not including federal income taxes,) of $30,000 and that from 1956 through 1963 he did not have sufficient income to require him to file federal income tax returns.

In the years 1965 and 1966—the ones now in issue—Dr. and Mrs. Geller in their tax returns made no reference to the "2377 Creston Corporation" or to any receipts therefrom. That corporation had been incorporated in 1950 by Dr. Geller, his wife, and her sister, Regina Strasfeld. They had become the sole directors and shareholders of that corporation. It was located at the taxpayers' residence, 135 Ridge Street, New York City. The corporation engaged in the real estate business and securities trading.

In 1965 that corporation filed a federal corporate income tax return, signed by appellant William Geller as president, in which it reported $117,184.19 gross income from the installment sale of a building sold by it in a prior year, and $70,859.70 income from dividends before the dividends-received deduction.

In 1966 that corporation again filed a federal income tax return, again signed by William Geller. It reported no installment income, but a taxable loss of $10,224.09.

---

* Chief Judge for the District of Vermont, sitting by designation.

** Senior District Judge for the District of Massachusetts, sitting by designation.

For both 1965 and 1966 the 2377 Creston Corporation corporate income tax returns were prepared by Mason S. Greenland, an accountant, from figures supplied by Dr. Geller. Dr. Geller did not give Greenland books of original entry, but merely total figures of alleged income and expenses. The corporate returns for 1965 and 1966 showed balance sheets of the corporation indicating that its assets in cash which had been $242,622.70 on December 31, 1964 had been reduced by the end of 1965 to $12,-128.48 and by the end of 1966 to zero. Among the liabilities, however, long term mortgages and notes were also reduced from $210,072.86 at the end of 1964, to $52,282.86 in 1965, to zero in 1966. Without explanation, surplus reserves which stood at $143,592.24 on December 31, 1964 were stated as being "zero" as of December 31, 1965 and again as of December 31, 1966.

In its 1965 return the corporation showed that it paid compensation of $7,000 to Murray L. Geller, (the 24 year old son of taxpayers), as secretary, and of $5,200 to Irwin Geller, (the 21 year old son of taxpayers), who is referred to as "president" [despite other documents which indicate that his father, Dr. Geller, was president]. In its 1966 return the corporation showed no compensation of officers.

On June 17, 1965 Dr. Geller personally opened with the firm of Merrill Lynch, Pierce, Fenner & Smith a brokerage account in the name of "Wolf Geller". (Appellants' brief in this Court virtually concedes that this was a name used by Dr. Geller as though it were his own; and that he intended to have the account benefit him and not any other person known to him.) Dr. Geller gave as Wolf Geller's address 318 East 149th Street, Bronx, New York, which was the business address of Morris Geller, Dr. Geller's brother. Dr. Geller informed the brokers that his own net worth was $150,000.

There was deposited in the aforesaid brokerage account $203,612.78 in 1965 and $24,-151.25 during 1966. Among the 1965 deposits were four checks totalling $15,067.19, each of which was drawn upon an account of 2377 Creston Corporation in a different savings institution from which Dr. Geller had been authorized by the corporation to make withdrawals. Each check bore the successive endorsements of "William Geller", "Wolf Geller", and "Merrill Lynch, Pierce, Fenner & Smith".

For the account they had in the name of Wolf Geller, Merrill Lynch, pursuant to telephone orders from Dr. Geller, bought in 1965 bearer bonds costing $203,992.38, and in 1966 bearer bonds costing $24,151.25. Those bonds had been issued by agencies of the State of New York, and the coupon interest payable on them was exempt from federal and state personal income taxes payable by New York individual taxpayers. On at least six occasions Merrill Lynch delivered by hand some of those bonds to Dr. Geller who was accompanied by either his son or another young man. On other occasions Merrill Lynch mailed some of those bonds to "Wolf Geller" at the address of Dr. Geller's brother.

The Commissioner determined that Dr. Geller had fraudulently underreported his income and that Dr. and Mrs. Geller had understated their taxable income by $203,-612.78 in 1965 and by $24,151.25 in 1966. Those are the exact cost prices of the bonds delivered or mailed by Merrill Lynch to Dr. Geller or Wolf Geller.

After adjusting for deductions, the Commissioner determined that the taxpayers' additional normal tax liabilities were $111,-123.57 for 1965 and $5,598.89 for 1966, with additions only in the case of Dr. Geller of $55,561.79 for 1965 and $2,799.45 for 1966, claimed to be due, in accordance with Section 6653(b) of the Internal Revenue Code of 1954, on account of his frauds.

The taxpayers having sought review in the Tax Court, that tribunal made ultimate findings of fact that in 1965 the taxpayers received, but failed to report, income of $203,612.78 and in 1966 of $24,151.25, and that Dr. Geller fraudulently omitted income on his 1965 and 1966 federal income tax returns, with an intent to evade the tax.

In an opinion accompanying the order, Judge Quealy of the Tax Court ruled (1)

that it had not been arbitrary for the Commissioner to have determined that the unexplained deposits in the account at Merrill Lynch in the name of Wolf Geller were income of Dr. Geller, (2) that inasmuch as the Commissioner's determination was supported by evidence and was neither arbitrary nor unreasonable, a presumption of correctness attaches to the Commissioner's determination, (3) that the Commissioner's notice of deficiency adequately informed Dr. Geller of the basis for the proposed determination, (4) that Dr. Geller did not point to any evidence which the Commissioner obtained through illegal acts, (5) that the Commissioner had not withheld from Dr. Geller evidence helpful to his case, (6) that the Merrill Lynch records were admissible as business records, (7) that the Tax Court did not believe the testimony of Dr. Geller that (a) in Merrill Lynch transactions he acted as his brother's agent or that the brokerage account was for his brother's account, or (b) that "Wolf Geller" was the name of a genuine person or the Hebrew name of Dr. Geller, or (c) that all the bonds were mailed by Merrill Lynch and were not delivered by hand to Dr. Geller personally in six instances, and (8) that the evidence affirmatively showed that Dr. Geller's activities were conducted with fraudulent intent, as, for instance, when he attempted to conceal his deposits to the brokerage account, when he opened the account in a name other than the one which he normally used, and when he failed to keep records of the sources of his deposits. The Tax Court judge concluded that Dr. Geller "fraudulently understated his income with the intention of evading taxes. Accordingly, the statute of limitations does not bar the assessment, and . . . [Dr. Geller] . . . is liable for the addition to tax under Section 6653(b)" of the Internal Revenue Code of 1954. The Tax Court also accepted as correct the Commissioner's determinations of amounts of underreporting of income by Dr. and Mrs. Geller.

On August 18, 1976 the Tax Court issued its order that there were due from Dr. and Mrs. Geller deficiencies of $111,123.57 for 1965 and $5,598.89 for 1966, and were due from Dr. Geller additions to tax, pursuant to Section 6653(b) of the Internal Revenue Code of 1954 of $55,561.79 for 1965 and $2,799.45 for 1966.

In their appeal to this Court the taxpayers contend that (I) the Tax Court erroneously applied a presumption of correctness in favor of the Commissioner's determination that the disputed deposits were income to them, (II) the Commissioner failed to bear his burden of proof by clear and convincing evidence, (III) the Tax Court's finding of fraud is inconsistent with (a) the likelihood that Dr. Geller foresaw that because of his prior detected wilful evasions of federal income taxes the Internal Revenue Service would carefully examine corporate returns signed by him, (b) the facts that the Merrill Lynch account showed the name of the customer as Wolf Geller and the customer's address as the business office of Dr. Geller's brother and it was to that address that the bonds were mailed, and (c) the fact that the living expenses of Dr. Geller were "extremely moderate", (IV) the Commissioner made a "less than rudimentary" investigation into the ownership of the bonds, and (V) the Tax Court improperly cited "Exhibit S for identification", a memorandum not admitted in evidence, and makes an unsupported statement that Dr. Geller refused to meet with the Commissioner's agents in connection with an inquiry into his individual tax liability.

The taxpayers pray that because of the Commissioner's supposed failure to prove fraud, and failure to perform his investigative duties, the decision of the Tax Court should be reversed, with a direction to enter decision for the taxpayers on the ground that the three-year period of limitations fixed by Section 6501 of the Internal Revenue Code of 1954 barred the Commissioner's assessments.

On the basis of our examination of the record we affirm the order of the Tax Court on the ground that there is, without the aid of any presumption, clear and convincing evidence of the fact, and the amount, of the fraud of the taxpayer Dr.

William Geller. As will appear, our reasoning differs from that of the Tax Court, but is, nonetheless, wholly consistent with the Commissioner's determinations and with the presentation of the case.

We do not pause over the possibly improper but certainly non-prejudicial references in Judge Quealy's opinion to "Exhibit S for identification" and to the alleged uncooperativeness of Dr. Geller in the investigation of his taxes. We look at the record as a whole which has a constant drum beat of fraud to which our ears are not deaf.

Dr. Geller, even according to admissions in his own counsel's brief, was shown to be a man who, despite the fact that in 1965 and 1966 he was making no money from his profession as a doctor, had no acknowledged outside income, and in the previous year, 1964, had filed, in order to compromise federal income tax liabilities of $170,414.67, Form 433 wherein he stated that he had assets of only $650 and liabilities, not including federal income taxes, of $30,000, was living at an "extremely moderate" standard. Thus, it is plain that, by his own account, Dr. Geller must have been using moneys from either charity, gifts, non-reportable income, or non-reported income.

Among those possible sources the last was directly pointed to by the accusatory finger of fact. Dr. Geller personally received, by hand delivery from Merrill Lynch, on six separate occasions, bearer bonds issued by agencies of the State of New York, and carrying interest coupons which when paid would not constitute taxable income, under either federal or state law. Merrill Lynch mailed similar bonds to "Wolf Geller" at the address of Dr. Geller's brother. Certainly those bonds were not charitable gifts from Merrill Lynch. Nor were they bought from deposits made with Merrill Lynch by some good Samaritan. In each case the bonds had been purchased by Merrill Lynch for an account listed under the name of "Wolf Geller". That name had been furnished to Merrill Lynch by Dr. Geller when he personally opened the account with Merrill Lynch and gave them a statement of his own net worth.

The only deposits *to* that account which were fully traced were four checks, totalling $15,067.19. Each of those checks was drawn upon a savings institution in which there was an account in the name of 2377 Creston Corporation, a corporation for which Dr. Geller was authorized to act. Each check was endorsed in the names of Dr. Geller as authorized agent for that corporation, "Wolf Geller", and Merrill Lynch. Moreover it is an irresistible inference that it was Dr. Geller who deposited with Merrill Lynch for the "Wolf Geller" account all the other sums credited to that account, and which, together with the aforesaid checks, totalled $203,612.78 in 1965 and $24,151.25 in 1966.

It is not necessary for the Commissioner, or for the Tax Court, or for us to know in detail how, where, why, and when Dr. Geller got the funds he deposited in the brokerage account. According to his own statement on Form 433 he had no assets in 1964. We need not indulge in the absurd hypothesis that a relative or friend gave him, or that on the sidewalks of New York he found, more than $200,000. It is transparent that he received from somewhere taxable income which he deposited in the brokerage account.

However, if we were required to trace the source, the record would be adequate.

In 1965 and 1966 there was an unexplained decline of $143,592.24 in the surplus reserves and a partially unexplained decline in the cash assets of 2377 Creston Corporation, an entity created by, controlled by, and acting obviously as an *alter ego* of, Dr. Geller, and as nothing else whatsoever. Dr. Geller was president, and he, his wife, and his sister-in-law were the sole shareholders, of 2377 Creston Corporation, and he and his 24 and 21 year old sons were the only officers. That corporation in 1964 had assets of $471,732.60 and liabilities of only $210,072.86 for long term mortgages and notes, as well as liabilities for common stock, surplus reserves, and earned surplus. On December 31, 1966 it had assets of only $145,227.20 and no liabilities whatsoever aside from common stock and earned sur-

plus. Thus it is transparent that Dr. Geller took funds from 2377 Creston Corporation, deposited them in the "Wolf Geller" account at Merrill Lynch, and ordered Merrill Lynch to buy bearer bonds of what is commonly called a "tax-exempt" type.

But, plain as is what were the sources of the deposits *to* the Merrill Lynch account, what is far more significant is what were the withdrawals *from* that account. Clear and convincing is the evidence that the bonds in that account were delivered to Dr. Geller, often under a pseudonym, sometimes in person, sometimes by mail. Those bonds were income to him. The receipt of them under a pseudonym was part of a fraudulent scheme. The omission of reference in the tax return to those bonds which represented such a large part of the income of Dr. Geller could be due only to fraud. And the amount of the underreporting is clearly established by the cost of the bonds.

Each link in the Commissioner's determination, and, for that matter, in the Tax Court's opinion, has a tight grip upon each successive member of the chain. In this iron linkage, no gossamer threads of presumption as to the fact of, or the size of, the fraud are required. Dr. Geller has been caught dollar by dollar in his fraudulent scheme.

The suggestion in the taxpayers' brief that when the evidence clearly and convincingly proves a taxpayer's fraud there remains some obligation upon the Commissioner to pursue every possible lead to see if *he* can exculpate the taxpayer can perhaps be best described—in the present context— as "presumptuous". The question raised by appellants, as to whether a public officer who detects a person making statements when the officer is persuaded are not merely false but made with knowledge of their falsity must then undertake a search for evidence that the detected person has a *possible* basis for exculpation, is preposterous. To quote an oft-repeated phrase of Chief Justice Edward Douglas White "to state the question is to give the answer". If there is a way "out of blame" it is the errant taxpayer who must find the avenue of escape from the corner in which he has been caught.

Judgment enforcing the Tax Court's August 18, 1976 order.